## NATIONAL SURETY CO. v. MUTUAL VENEER CO.
### No. 6090.

Circuit Court of Appeals, Sixth Circuit.
June 29, 1933.

N. C. Snyder, of Grand Rapids, Mich. (Cleland & Snyder, of Grand Rapids, Mich., on the brief), for appellant.

Morton Keeney, of Grand Rapids, Mich. (Butterfield, Keeney & Amberg and R. Dale Law, all of Grand Rapids, Mich., on the brief), for appellee.

Before MOORMAN, HICKS, and SIMONS, Circuit Judges.

HICKS, Circuit Judge.

Suit at law by Mutual Veneer Company, a corporation, and appellee, engaged in the manufacture and sale of veneer and similar products, against National Surety Company, an indemnity insurance company, and appellant, upon a credit insurance policy issued September 3, 1929, and designed to protect against losses caused by the insolvency of customers to whom credit had been extended. The particular losses here involved were upon shipments made by appellee between September 3, 1929, and November 16, 1929, to Sonora Phonograph Company, Inc. Appellee had judgment.

Appellant by various assignments of error, challenging the denial of a directed verdict, the correctness of the charge, and the court's refusal to give certain requested instructions, raises two points.

The first is that, in the application for the policy, appellant misrepresented both the amount of its gross sales covering the period from December 21, 1924, to June 1, 1929, and its losses sustained by reason of extension of credit during that period; and that appellant warranted the truth of these misstatements, and the warranty being made the basis of the policy, upon its breach the policy became void.

This contention is based upon the following undisputed facts: Danehower, a soliciting agent of appellant, a New York corporation, began negotiations with McCoy, president of appellee, a Michigan corporation located in Grand Rapids. These negotiations culminated in the issuance of a policy, the application of which contained the following printed statement: "As a basis of the Policy hereby applied for, and of any Policy of Credit Insurance which may hereafter be issued to us, we warrant the following statement of our sales, losses and the amounts owing by debtors under general extension, to be correct."

Following this statement, the gross sales of appellee, less allowances and returns for

the years ending December 31, 1924 to 1928, inclusive and for the fractional part of the year 1929 from January 1st to June 1st were set forth. The discrepancies for the five-year period ending December 31, 1928, between the amounts of the gross sales less allowances and returns thus appearing in the application and the actual net sales for that period were small, being less than 1 per cent., and a difference which ordinarily would be regarded as insubstantial. However, there was a substantial variance, $25,758.29, in the stated and actual amount of gross sales less allowances and returns for the five-month period ending June 1, 1929. In the application it was asserted to be $124,684.49; actually it was $98,850.20. The only loss reported in the application was one for $450 in the year 1928.

It is undisputed that Danehower himself inserted in the proper blanks of the application the amount of this loss together with the amounts of gross sales and allowances. He took his figures for the years 1924 to 1928, inclusive, from a personal record kept by McCoy, and checked them against the books of the company as far as he desired to do so. McCoy's personal record was complete only for the first four months of the year 1929, so that Danehower, accepting it for those months, added thereto the figures for the months of May and June from the sales book of appellee. He then inserted the amount so arrived at as the gross sales less allowances and returns for the year 1929 to June 1st, when in reality the figures embodied the sales to July 1st. It is conceded that McCoy's part in the whole transaction was in good faith, and that the errors or mistakes were not due in any way to fraud or wrongdoing upon his part.

But appellant points to a provision in the application that the policy and the application constituted the entire agreement and to still another provision as follows: "It is also agreed that this application, whether as respects anything contained therein or omitted therefrom, has been made, prepared and written by the applicant, or by his own proper agent," and insists that under these provisions Danehower was the agent of appellee so that the errors in the figures amounted in fact to a breach of warranty and voided the policy from the beginning, regardless of whether they were great or small, or material to the hazard or were made in good or bad faith. In support of its contention, appellant relies upon such cases as American Credit Indemnity Co. v. Carrollton Fur. Mfg. Co., 95 F. 111 (C. C. A. 2); Rice v. Fidelity & Dep. Co., 103 F. 427 (C. C. A. 8); National Surety Co. v. Long, 125 F. 887 (C. C. A. 8) and many others.

We do not accept these cases as controlling in the present circumstances. Section 12444 of the Compiled Laws of Michigan of 1929, printed in the margin,[1] must be given consideration and effect if, as we think, it is applicable to credit insurance. See Penn Mutual Life Ins. Co. v. Mechanics' Savings Bank & Trust Co., 72 F. 413, 419, 38 L. R. A. 33 (C. C. A. 6).

Michigan has a comprehensive general insurance law divided into five parts and embracing sections 12243 to 12689, inclusive, of the Compiled Laws of Michigan 1929. Part 3 is entitled "Life and Casualty Insurance." Section 1 of chapter 1 of part 3 (Comp. Laws 1929, § 12388) prohibits the issuance of life or casualty policies under any authority whatsoever other than that of the statutes of the state.

Section 2 of chapter 1, subdivision 1, this same part (Comp. Laws 1929, § 12389), makes provision for the organization of corporations for the purpose of "making any of the following kinds of insurance"; then follows (1) Life insurance; and (2) various kinds of insurance described under twelve separate paragraph headings, to wit, Fidelity, Steam Boiler, Accident and Health, Automobile, Plate Glass, Sprinkler, *Credit*, Title, Burglary and Theft, Livestock, Burial, and Malpractice. Some of these headings fall clearly within the common definition of the term "casualty insurance," and from the context we think that all of them, including credit insurance, were intended to be so classified and to be distinguished from life insurance for the purposes of the act, for, following these specific descriptions, the act in the next paragraph makes provision for insurance "against any *other* hazards of a *casualty* nature. * * * *" That such was the intention of the Legislature seems to be likewise confirmed by subdivision 2 of chapter 1 of part 3 (section 6 [Comp. Laws 1929, § 12393]), which designates the *"business of casualty insurance"* such as is *"set forth in section two [2], subdivision one, of this part."* (Italics ours.)

These same reasons support our belief that it was intended to include credit insur-

---

[1] "12444. *False Statements in Application; Effect.* Sec. 17. The falsity of any statement in the application for any policy covered by this chapter shall not bar the right to recovery thereunder unless such false statement was made with actual intent to deceive or unless it materially affected either the acceptance of the risk or the hazard assumed by the insurer."

ance contracts under the general phrase "Casualty Insurance Contracts" found in the title (Life and Casualty Insurance Contracts) to chapter 2 of part 3 of the Michigan Insurance Act, and that section 12444, which is section 17 thereunder, and which applies to "any policy covered by this Chapter," applies to credit insurance contracts. The District Judge so construed the section in his instructions, saying: "Upon this subject you are instructed that a false statement in the application does not bar plaintiff's right to recover, unless such false statement was made with actual intent to deceive, or unless it materially affected either the acceptance of the risk by the defendant or the hazard assumed by the defendant."

The court also said to the jury: "You are further instructed that no misstatement of losses in the application made by plaintiff will avoid the policy unless you find that plaintiff in giving answers in the application made false statements as to losses with actual intent to deceive or unless such false statements materially affected either the acceptance of the risk or the hazard assumed by the insurer."

Counsel for appellant having conceded that, in making the application, McCoy acted in good faith, the court might well have instructed the jury as a matter of law that any false statement therein was not made with actual intent to deceive. It might also have stated that there was no evidence that any falsity in the application affected the acceptance of the risk. We think the evidence is sufficient to support the conclusion that the variance between the reported and actual gross sales, less allowances and returns, for the five-month period ending June 1, 1929, which was the only substantial variance for any period, had little, if any, bearing on the assumption of the hazard. There is nothing in appellant's evidence indicating that it did, and upon the other hand there is evidence that, although the policy was issued upon the basis of anticipated gross sales of $400,000, during no year of the period reported, except 1926, had the gross sales, less allowances and returns, reached $400,000, and for that year the excess was only $2,755.16. Further, there was evidence that the loss of $450 reported in the application for the year 1928 was substantially correct.

Upon the whole we think that there was no error in the instructions of which appellant can rightfully complain, and that the verdict finds ample support in the evidence.

We pass to the appellant's second proposition—that the loss was not covered by the policy because upon the dates of the shipments the Sonora Company did not have in the latest published book of the Lyon Furniture Mercantile Agency the capital and credit rating tabulated in and required by the terms of the policy. The material portions of the coverage clause of the policy are printed in the margin.[2]

The Lyon Agency published a reference book called the "Lyon-Red Book." There were two editions annually. One was published January 1st, and the other on July 1st, of each year. These Lyon-Red Books contain the capital and credit ratings of concerns dealing in veneer and the woodworking arts generally, and consist of nearly 1,000 pages each. The July Book, 1929, is entitled "Reference Book of the Lyon Furniture Mercantile Agency."

In addition to these Red Books, the Lyon Agency published weekly for the benefit of its subscribers a "Lyon Weekly Report and Supplement," which was designed to keep the information contained in the Red Book up to date. These weekly supplements were published in sheet form and usually comprised a four-page folder. They were mailed to the subscribers of the Lyon Agency immediately upon their publication. The agency published and distributed one of these "Weekly Reports and Supplements," consisting of four sheets, on August 3, 1929.

Besides the "Red Book" and the "Weekly Report and Supplement," the Lyon Agency furnished to its subscribers upon request what is called a "Compiled Report." It contained special information without particular reference to the capital or credit rating of the customer concerning whom the subscriber has made inquiry.

---

[2] "Coverage.—*No loss is covered by this Policy, unless the debtor to whom the goods were shipped and delivered shall have in the latest published book of the Lyon Furniture Mercantile Agency, at the date of the shipment, a capital rating and its accompanying credit rating, as tabulated below.*

"*The books of the said Mercantile Agency shall respectively govern shipments from the first day of the month named by said book to the first day of the month named by the next subsequent book, except that where the said Mercantile Agency increases or reduces a rating by report, compiled during the currency of the said latest published book or within thirty (30) days prior to the date thereof, shipments made after the Insured has received such compiled report from the said Mercantile Agency shall be governed by the rating in such report, the same as if the said rating had appeared in the said latest published book, provided such increased or reduced rating appears in the tabulation below; otherwise losses arising from such shipments made after the Insured has received such compiled report shall not be covered by this Policy.*" (Italics ours.)

We need not given any further consideration to this feature because no such special report was ever requested or received by appellee.

The "Weekly Report and Supplement" of August 3, 1929, which appeared prior to the shipments made to the Sonora Company, reduced the rating of that company from the "13—b—4," carried in the Red Book of July, 1929, to "13—6." (The numeral 13 is not particularly significant because it referred to special credit conditions other than capital or credit rating.) This "13—6" rating did not appear in the table of ratings subjoined to the policy and by virtue of the second paragraph of the coverage clause of the policy would have discharged appellant from liability, had appellee received the report or had knowledge of it prior to the shipments to the Sonora Company. But it is undisputed that appellee had neither received the report nor acquired any knowledge of it. At the time appellee made application for the policy, Mr. McCoy told Mr. Danchower, appellant's agent, that appellee had never been, and did not contemplate becoming, a subscriber to the Lyon Agency. The clause in the application that "we have been subscribers to said Mercantile Agency during the past * * * years" raises no suggestion to the contrary.

But appellant insists that, regardless of whether appellee received the second rating, it is discharged of liability because the "Weekly Report and Supplement" of August 3, 1929, should by proper construction be identified as the "Latest Published Book of the Lyon Furniture Mercantile Agency at the date of the shipment."

When measured by the rules recognized in Sampliner v. Maryland Casualty Co., 63 F. (2d) 332 (C. C. A. 6), we cannot accept appellant's view. We do not regard the four sheets composing the Lyon "Weekly Report and Supplement" of August 3, 1929, as being in any sense a book. This publication of August 3d is no more than it professes to be; that is, a weekly report and supplement. Such a report is styled by appellant's witness Doreman as a "supplemental sheet" and by Mr. Clemens in his letters of October 22d and November 7th as a "bulletin." These weekly reports are referred to in the July, 1929, Red Book as "The Weekly Credit Report Sheets" or "Weekly Sheets." We think that the Red Book of July, 1929, was clearly, in the contemplation of the parties, the "Latest Published Book of the Lyon Furniture Mercantile Agency" referred to in the first paragraph of the coverage clause of the policy, and, to substitute the four sheets issued on August 3, 1929, therefor, would in effect make a contract for the parties which they had not made for themselves. We regard these sheets as nothing more than a "report," compiled, during the currency of the "Latest Published Book," for the benefit and information of appellant's subscribers under their contracts.

If we conceived that we were dealing with a doubtful question as to what was meant by the "Latest Published Book" in the coverage clause of the policy, we would still be constrained to interpret it in favor of appellee, upon the principle that insurance policies, if ambiguous in their language, are to be construed strictly against the insurer by whom they were framed. Philadelphia Casualty Co. v. Fechheimer, 220 F. 401, 417, Ann. Cas. 1917D, 64 (C. C. A. 6).

In the view we have taken as to the defenses urged by appellant, i. e., that there was (1) a breach of warranty; and (2) that the loss sued for was not covered by the policy, we regard the assignments of error based upon alleged improper introduction of oral evidence and documentary exhibits as irrelevant and without substantial merit, and these assignments are therefore overruled.

Judgment affirmed.